[606 NYS2d 325]

Long Island Power Authority et al., Respondents-Appellants, v Shoreham-Wading River Central School District et al., Appellants-Respondents.

Second Department, January 10, 1994

## APPEARANCES OF COUNSEL

*Lewis & Greer, P. C.,* Poughkeepsie *(Lou Lewis* of counsel), for Shoreham-Wading River Central School District, appellant-respondent.

*Robert J. Cimino, County Attorney* of Suffolk County, Hauppauge *(Robert L. Garfinkle* of counsel), for County of Suffolk, appellant-respondent.

*Block, Amelkin & Hamburger,* Smithtown *(Richard Hamburger* of counsel), for Shoreham-Wading River Public Library and another, appellants-respondents.

*Murphy Bartol & O'Brien,* Mineola *(Ernest T. Bartol* and *Jeffrey P. Sharkey* of counsel), and *Emily Pines, Town Attorney* of Town of Brookhaven, Medford, for Town of Brookhaven and another, appellants-respondents. (One brief filed.)

*Rivkin, Radler & Kremer,* Uniondale *(Arthur J. Kremer, Evan H. Krinick* and *Merril S. Biscone* of counsel), and *Richard P. Bonnifield,* Garden City, for Long Island Power Authority, respondent-appellant. (One brief filed.)

*Robert J. Grey,* Hicksville *(Ronald J. Macklin* of counsel), and *Shea & Gould,* New York City *(Michael Lesch* and *John G. Nicolich* of counsel), for Long Island Lighting Company, respondent-appellant. (One brief filed.)

## OPINION OF THE COURT

Per Curiam.

In this declaratory judgment action, we are called upon to construe that section of the Long Island Power Authority Act that obligates the plaintiff Long Island Power Authority to make certain payments in lieu of taxes to the defendants, the taxing jurisdictions within which the Shoreham nuclear power plant is located.

### I

In 1986, the Legislature determined that "a situation threatening the economy, health and safety" existed on Long Island due to "[c]onstantly escalating and excessive costs of electricity" (Public Authorities Law § 1020-a). As a result of

these increased costs, there developed "a lack of confidence that * * * electricity can be supplied in a reliable, efficient and economic manner by the Long Island lighting company" (Public Authorities Law § 1020-a). The direct cause of these excessive costs and lack of confidence was the "imprudent" construction of the Shoreham nuclear power plant (hereinafter Shoreham) by the Long Island Lighting Company (hereinafter LILCO).

In order to remedy this situation, the Legislature enacted the Long Island Power Authority Act (Public Authorities Law § 1020 *et seq.*). This created the Long Island Power Authority (hereinafter LIPA) which was entrusted with the task of replacing LILCO "with a publicly owned power authority" (Public Authorities Law § 1020-a). LIPA was given the authority to acquire all or part of the assets of LILCO through a negotiated agreement, a tender offer for LILCO's stock, or its exercise of the power of eminent domain *(see,* Public Authorities Law § 1020-h). LIPA was given discretion to determine which mode of acquisition to employ *(see, Matter of Citizens For An Orderly Energy Policy v Cuomo,* 78 NY2d 398, 407-408). LIPA's use of its powers was to be guided by the goal of minimizing electrical rates *(see,* Public Authorities Law § 1020-h [2]). LIPA, however, was specifically prohibited from constructing and operating a nuclear-powered facility and was specifically directed to "close and decommission" Shoreham "[a]s soon as practicable" (Public Authorities Law § 1020-h [9]; § 1020-t).

As a tax-exempt public authority, LIPA is not required to pay any taxes or assessments "upon any of the property acquired or controlled by it" (Public Authorities Law § 1020-p [2]). However, to cushion the financial blow to those jurisdictions that taxed property acquired by LIPA from LILCO, LIPA is required, pursuant to Public Authorities Law § 1020-q (1), to make "payments in lieu of taxes" (hereinafter PILOTS) *(see, Matter of Long Is. Light. Co. v Assessor of Town of Brookhaven,* 154 AD2d 188, 194).

## II

The "closure of Shoreham was one of the overriding engines driving the emergency legislative initiative and package" that resulted in the LIPA Act *(Matter of Citizens For An Orderly Energy Policy v Cuomo,* 78 NY2d 398, 411, *supra).* In furtherance of this end, and pursuant to an agreement dated Febru-

ary 28, 1989, LIPA and LILCO agreed that Shoreham would be transferred to LIPA for $1 *(see, Matter of Citizens For An Orderly Energy Policy v Cuomo,* 78 NY2d 398, 408-410, *supra; Matter of Long Is. Light. Co. v Assessor of Town of Brookhaven,* 154 AD2d 188, 190, *supra; see also, Long Is. Light. Co. v Cuomo,* 888 F2d 230). Shortly after the agreement was reached, Shoreham was granted a full operating license. On June 12, 1991, the United States Nuclear Regulatory Commission downgraded the license on Shoreham to a possession-only license. Shoreham was actually transferred to LIPA for $1 on February 29, 1992.

## III

When the Long Island Power Authority Act was passed, the annual total of real property taxes assessed on the Shoreham parcel exceeded $60,000,000. The assessed taxes generally increased each year thereafter until they reached a total of $82,066,699 for the 1991-1992 tax year, when ownership of Shoreham was transferred to LIPA. During that tax year, the assessed valuations on the parcel where Shoreham is situated totalled $156,759,980. Prior to the transfer of Shoreham, LILCO had made one half of its tax payment for the 1991-1992 tax year, paying approximately $41,000,000. The second half of the payment was due on May 31, 1992 *(see,* Suffolk County Tax Act § 13 [c]).

Negotiations between LIPA, LILCO, and the defendants resulted in an agreement whereby further payments were made to the defendants. Pursuant to this agreement, on or about June 1, 1992, LIPA tendered a check to the Town of Brookhaven in the amount of $40,891,509.59. At the same time, LILCO tendered a check in the amount of $141,839.97, representing the taxes attributable to the real property LILCO retained after its transfer of the Shoreham plant. Thus, the defendants received payments totalling over $82,000,000 during the 1991-1992 tax year.

The agreement between the parties further provided that LIPA would make two subsequent payments to the defendants. The first was to be made on or about January 10, 1993, and would be $40,891,409.59. The second was to be made on or before May 31, 1993, and would be $36,802,358. LIPA has represented that these payments have in fact been made.

## IV

The instant declaratory judgment action was commenced by

LIPA in June 1992. LILCO was subsequently given permission to intervene as a plaintiff. As noted, the action seeks an interpretation of that provision of the Public Authorities Law that obligates LIPA to make PILOTS. Generally, the resolution of the issues raised by the parties will determine when and in what amount PILOTS are to be made.

Upon the parties' respective motions for summary judgment, the Supreme Court generally upheld the positions of LIPA and LILCO as to when PILOTS are to commence and how they are to be determined.

Public Authorities Law § 1020-q (1) provides as follows:

"§ 1020-q. Payments in lieu of taxes

"1. Each year after property theretofore owned by LILCO is acquired by the authority by any means authorized by this title and, as a consequence, is removed from the tax rolls, the authority shall make payments in lieu of taxes to municipalities and school districts equal to the taxes and assessments which would have been received from year to year by each such jurisdiction if such acquisition had not occurred, except for such taxing jurisdictions which tax the Shoreham plant, in which case the in lieu of tax payments shall in the first year after the acquisition be equal to one hundred percent of the taxes and assessments which would have been received by such taxing jurisdictions. In each succeeding year such in lieu of tax payments shall be decreased by ten percent until such time as such payments equal taxes and assessments which would have been levied on such plant in a nonoperative state" (L 1986, ch 517, § 1).

■ The plaintiffs take the position that LIPA's PILOT obligation commenced on March 1, 1992, the day after Shoreham was transferred. In this regard, LILCO specifically argues that it is entitled to a refund for any taxes that it paid, attributable to that portion of the tax year that remained after the date of its transfer of the Shoreham property. The defendants, on the other hand, argue that the PILOT obligation did not commence until after the 1991-1992 tax year ended on November 30, 1992. In support of their position, the defendants argue that the statute should be read as providing a two-pronged precondition for the commencement of PILOTS. They assert that property must be *acquired* by LIPA *and* removed from the tax rolls. So viewed, according to the defendants, the $40,891,509.59 paid by LIPA on or about June 1, 1992, pursuant to the negotiated agreement between the

parties must be characterized as a tax payment and not, as the plaintiffs argue, the first installment of PILOTS.

As did the Supreme Court, we disagree with the defendants. The statute unambiguously states that PILOTS attributable to the Shoreham property "shall in the first *year* after the acquisition be equal to one hundred percent of the taxes and assessments which would have been received by such taxing jurisdictions" (Public Authorities Law § 1020-q [1]; emphasis supplied). No restriction is apparent, on the face of the statute, which would serve to postpone the commencement of PILOTS attributable to the Shoreham property. To impose the limitation urged by the defendants would be contrary to the clear import of the statute *(see,* McKinney's Cons Laws of NY, Book 1, Statutes §§ 94, 254; *see also,* General Construction Law § 58; *O'Dea v School Dist.,* 122 AD2d 553).

In support of their argument that PILOTS are not payable until the 1991-1992 tax year ends, the defendants additionally rely on the general rule that real property tax is due and payable when it becomes a lien. In the instant case, LILCO had not yet transferred the Shoreham property when the taxes assessed against the Shoreham property for the 1991-1992 tax year became a lien *(see,* Suffolk County Tax Act § 13 [b]). The defendants assert that they are entitled to employ the remedies and procedures enumerated in the Real Property Tax Law and the Suffolk County Tax Act to enforce payment of the remainder of real property taxes due for the 1991-1992 tax year *(see,* Real Property Tax Law §§ 926, 990, 992; Suffolk County Tax Act § 13 [b]; 99 NY Jur 2d, Taxation and Assessments, §§ 552, 555).

Again, we disagree with the defendants and conclude that the Legislature intended that the Long Island Power Authority Act make PILOTS a complete substitution for real property taxes and assessments that otherwise would be due on the Shoreham property. With respect to the defendants' argument, we observe that the Long Island Power Authority Act makes no reference to the remedies provided by the Real Property Tax Law and the Suffolk County Tax Act (Public Authorities Law § 1020-p [2]; *cf.,* Public Authorities Law § 1020-cc). We decline to engraft those remedies upon the Long Island Power Authority Act in the manner urged by the defendants *(see,* McKinney's Cons Laws of NY, Book 1, Statutes § 240; *Matter of Railroad Maintenance Corp. v New York City Tr. Auth.,* 146 AD2d 780, 781). Accordingly, we affirm the holding of the Supreme Court that LILCO is not obligated to

the defendants for any real property taxes attributable to property it conveyed to LIPA, that accrued after that conveyance. We note that, to the extent the Long Island Power Authority Act is inconsistent with other laws, it controls *(see,* Public Authorities Law § 1020-gg).

We further note that the result of the interpretation urged by the defendants would be the imposition of an additional financial burden upon LILCO. Specifically, were we to sustain the defendants' position, LILCO would be responsible for the real property tax for the 1991-1992 tax year attributable to the Shoreham property after it was transferred to LIPA. As currently assessed, this would total approximately $61,000,000. Assuming, arguendo, that there was any ambiguity in the statute, to countenance the result urged by the defendants would be in direct contravention of the express statutory purpose of the Long Island Power Authority Act—the minimization of the escalating costs of electricity on Long Island *(see,* Public Authorities Law § 1020-a; *see also,* Governor's Approval Mem, 1986 NY Legis Ann, at 241-242; *Matter of Citizens For An Orderly Energy Policy v Cuomo,* 78 NY2d 398, 414, *supra).* Basic rules of statutory construction militate against such a holding *(see,* McKinney's Cons Law of NY, Book 1, Statutes § 92; *see also, Prego v City of New York,* 147 AD2d 165; *see also, Matter of Sutka v Conners,* 73 NY2d 395, 403).

## V

■ The Supreme Court additionally found that PILOTS are to be based, in the first instance, on the "taxes and assessments which LILCO would have been required to pay on the property conveyed to LIPA for the period March 1, 1992—February 28, 1993 had the conveyance to LIPA not occurred". Crucially, the court concluded that the calculation of PILOTS is to be made subject to any adjustment in the assessed value of the Shoreham property occurring as a result of various tax certiorari proceedings commenced by LILCO under RPTL article 7.

In opposition to this holding, the defendants cite Public Authorities Law § 1020-q (3), which provides that generally, neither LIPA nor "any other entity" may seek a tax refund "of property taxes originally assessed against the Shoreham plant". The defendants claim, in view of this proscription against seeking a refund, that there is no existing procedure whereby the tax assessment placed on the Shoreham property

may be reduced. Therefore, the defendants argue, whatever tax assessment was in place when Shoreham was transferred should equal the first PILOT installment (see, Public Authorities Law § 1020-q [1]).

This Court has previously held Public Authorities Law § 1020-q (3) is unconstitutional as applied to LILCO (see, *Matter of Long Is. Light. Co. v Assessor of Town of Brookhaven,* 154 AD2d 188, *supra).* Thus, there is no statutory prohibition against the maintenance by LILCO of any tax certiorari proceeding with respect to the Shoreham property. The defendants' argument, which we note is contrary to the statutory intent underlying the LIPA Act, is therefore without merit.

## VI

Another significant issue raised by the parties is the duration and ultimate amount of PILOTS. The Supreme Court found that PILOTS should be paid in perpetuity. Under Public Authorities Law § 1020-q (1), these perpetual PILOTS would be equal to the "taxes and assessments which would have been levied on [the Shoreham] plant in a nonoperative state". The Supreme Court construed the term "nonoperative" to mean "incapable of generating electricity without regard to the Shoreham plant's state of construction".

In their cross appeal, the plaintiffs allege that the Supreme Court erred in concluding that LIPA's PILOT obligation is "perpetual". We disagree. Public Authorities Law § 1020-q (1), by its terms, does not limit the duration of PILOTS, and we will not impose such a limitation upon it. We disagree with the plaintiffs that any language in *Matter of Long Is. Light. Co. v Assessor of Town of Brookhaven* (154 AD2d 188, *supra)* requires a different result.

Further, we agree that the Supreme Court properly determined that the term "nonoperative" as used in Public Authorities Law § 1020-q (1) means "incapable of generating electricity without regard to the Shoreham plant's state of construction" (see, McKinney's Cons Laws of NY, Book 1, Statutes §§ 92, 94; *Village of Barker v Taylor,* 1 AD2d 433; *Matter of Caravetto v Springfield,* 54 Misc 2d 759, 760; see also, *United States v Insurance Co.,* 695 F2d 455, 456, n 5; *Dawson v Commonwealth of Ky., Dept. of Transp., Bur. of Highways,* 622 SW2d 212, 214 [Ky]; *State of Neb., Dept. of Rds. v Melcher,* 240 Neb 592, 483 NW2d 540). We note that the defendants argue that "nonoperative" means fully constructed and able to

generate electricity but without the necessary operating licenses. To accept the defendants' definition of "nonoperative" would be to require LIPA to make perpetual PILOTS based on the value of a fully constructed nuclear plant on the Shoreham site. The Legislature could not have intended such an incredible result when it passed the LIPA Act.

The defendants' remaining contentions are without merit (see, Melvin v Union Coll., 195 AD2d 447; Price Paper & Twine Co. v Miller, 182 AD2d 748, 750).

Accordingly, the order is affirmed insofar as appealed and cross-appealed from, with one bill of costs to the plaintiffs, payable by the defendants appearing separately and filing separate briefs.

SULLIVAN, J. P., O'BRIEN, RITTER and JOY, JJ., concur.

Ordered that the order is affirmed insofar as appealed and cross-appealed from, with one bill of costs to the plaintiffs, payable by the defendants appearing separately and filing separate briefs.